IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

RACHEL CARMICHEAL,          )
                            )
            Plaintiff,      )          4:07CV3225
                            )
      v.                    )
                            )          **MEMORANDUM**
HY-VEE, Inc.,               )          **AND ORDER**
                            )
            Defendant.      )

Rachel Carmicheal has filed suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, claiming a hostile environment and retaliation for complaining to a superior about offensive comments. This matter is before me on Hy-Vee's motion for summary judgment. (Filing 32.) I will grant the motion.

# I. BACKGROUND

## *Overview*

I begin with an overview of the case to provide a clear statement of Plaintiff's claim, in part because the specifics of Plaintiff's claims had to be parsed together from her poorly written brief.[1] Additionally, the number of undisputed facts might

---

[1]Plaintiff's brief, among other things, contains arguments in the narrative sections which conflict with the facts she accepts as controverted. In addition, the section on the *Ellerth-Faragher* affirmative defense was clearly copied from another brief filed by Plaintiff's counsel in a different case and does not reflect the facts of *this* case. (*See* filing 48 (D.'s Reply Br.) at 9-10 and filing 45 (Pl.'s Br. in Opp'n to Summ. J.) at 26-29.)

give the impression that this case is complicated, although it is very straightforward. After the overview, I list all undisputed facts.

Defendant operates several grocery stores in Lincoln, Nebraska. In July 2005, Plaintiff was promoted to the position of deli manager at one of the Lincoln stores. She was six months pregnant at the time. Some time after returning to work after the birth of her child and in January 2006, Plaintiff had a performance review. The review reflected that Plaintiff was not meeting expectations in twelve of thirty-six areas. Nine months after the performance review and on October 20, 2006, Plaintiff was presented with a one page list of expectations. Those expectations were tailored to Plaintiff's performance problems. The expectations document provided that if Plaintiff was not meeting the expectations by November 5, 2006, she would be subject to discipline which could include dismissal. Management concluded that Plaintiff did not meet the expectations, and on December 4, 2006 told her she was demoted. In a followup meeting on December 5, Plaintiff was told there was nothing she could do to keep her job. She resigned after learning that she was demoted.

Plaintiff asserts that there was an "overall climate of discrimination" in that she was exposed to four sexually suggestive comments, was taunted by an individual who made one of those comments when he was not disciplined as a result of investigation, and that the expectations imposed on her were harder to meet than those imposed on other male managers. Plaintiff asserts that a hostile environment caused her to be constructively discharged, and that Defendant retaliated against her for reporting a sexually suggestive comment (or comments) to regional store management.

I find that the suggestive comments did not create a hostile environment, that Defendant promptly investigated those comments that were reported once they were reported (some comments were not reported) and took appropriate action, and that Plaintiff's demotion was not retaliation for any activity protected by Title VII.

## *Undisputed Facts*

Defendant's brief includes sixteen pages of enumerated paragraphs of undisputed facts, supported as required by NECivR 56.1(a). Plaintiff's response does not effectively controvert any of those facts, for the reasons outlined in detail in Defendant's Reply Brief (filing 48 at 3-8).[2]  Those reasons are incorporated by reference, and I do not repeat them here.   In addition to the reasons noted by Defendant, I note that several times Plaintiff attempted to controvert facts and cited to portions of documents that were not in the record. *See*, *e.g.*, Filing 45 (Pl.'s Br. in Opp'n to Summ. J.) at 16 (referencing D.'s fact no. 93 and citing to a page of the transcript of the unemployment hearing [page 34] which is not in the record).)  As Plaintiff has failed to controvert any facts in Defendant's statement of facts, all of those facts are deemed admitted.[3]  NECivR 56.1(b)(1) ("Properly referenced facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.")

The material undisputed facts are set forth below.  Because the citations to the record are cumbersome, when referring to these facts later in this opinion I cite them as "Fact No. __" without further citation to the record.

---

[2]Plaintiff did note one instance in which the cited portion of the record did not support a statement of fact.  Defendant corrected that errant reference.  *See* Filing 48 (D.'s Reply Br.) at 6 (noting that Defendant's fact no. 26 is correctly supported by Filing 34-3 (Pl.'s Dep.) at 57:19-58:1).

[3]Plaintiff objected to five of Defendant's statements of fact on the basis of hearsay (filing 45 (Pl.'s Br. in Opp'n to Summ. J.) at 11-12, 15 (referring to D.'s fact nos. 66-67 & 86-88).)  I deny these objections, as the statements are not offered to prove the truth of the matter asserted but rather to prove why Defendant acted as it did.

-3-

_____**Plaintiff's Employment with Hy-vee**

1.      Hy-Vee owns and operates five grocery stores in Lincoln, Nebraska. (Filing 34-2 (Ludwig Aff.) at ¶ 2.)

2.      In April 2001, Hy-Vee hired Plaintiff to work at its store located at 2343 North 48th Street in Lincoln, Nebraska ("Lincoln #2").  (Filing 34-3 (Pl.'s Dep.) at 40:22-24.)

3.      Plaintiff started working at Lincoln #2 as a Kitchen Clerk.  (Filing 34-3 (Pl.'s Dep.) at 48:3-7.)

4.      Three months later, Hy-Vee promoted Plaintiff to Assistant Kitchen Manager.  (Filing 34-3 (Pl.'s Dep.) at 48:12-16.)

5.      When she was the Assistant Kitchen Manager, Plaintiff took six weeks of maternity leave.  (Filing 34-3 (Pl.'s Dep.) at 18:5-13.)

6.      When she returned from her maternity leave, Plaintiff did not experience any problems.  (Filing 34-3 (Pl.'s Dep.) at 18:14-16.)

7.      In July 2005, Hy-Vee promoted Plaintiff to Deli Manager.  In that position, Plaintiff reported to the Manager of Perishables (initially Brian Amsberry and later Gary McCormick).  The Manager of Perishables reported to the Store Director.  During this time period, Matt Ludwig served as the Store Director at Lincoln #2. (Filing 34-3 (Pl.'s Dep.) at 62:16-63:12; 91:21-23; 54:8-16; Filing 49-4 (Hy-Vee Leadership Hierarchy).)

8.     When Ludwig and Amsberry made the decision to promote Plaintiff to Deli Manager, Plaintiff was six months pregnant.  Plaintiff had her second child in October, 2005.  (Filing 34-3 (Pl.'s Dep.) at 17:20-22; 18:22-24.)

9.     Plaintiff remained in the Deli Manager position until her last day of employment on December 16, 2006.  (Filing 34-5 (Unemployment Hr'g T.) at 12:8-16.)

### Hy-vee's Discrimination and Harassment Policy And Training

10.     During her April 2001 orientation, Plaintiff received and reviewed a copy of Hy-Vee's Employee Handbook.  (Filing 34-3 (Pl.'s Dep.) at 41:3-11, 42:3-7; Filing 34-4 at CM/ECF page 1 (Ex. 4 to Pl.'s Dep., Receipt of Employee Handbook) and CM/ECF pages 2-18 (Ex. 5 to Pl.'s Dep, Employee Handbook).)

11.     Plaintiff knew that Hy-Vee's handbook contained a policy against discrimination and harassment.  (Filing 34-3 (Pl.'s Dep.) at 44:13-16.)

12.     She also knew that Hy-Vee's discrimination and harassment policy provided that a "complaint should be presented as soon as possible following a particular act or occurrence unless there is good cause for not presenting the complaint in a timely manner."  (Filing 34-3 (Pl.'s Dep.) at 44:13-45:12.)

13.     Plaintiff knew that Hy-Vee's discrimination and harassment policy identified a number of different people to whom she could complain about discrimination or harassment.  These people included the Assistant Store Director, Manager of Store Operations, Manager of Perishables, Manager of General Merchandise, Store Director, or Hy-Vee's Vice President of Human Resources. Although Plaintiff did not know Hy-Vee's Vice President of Human Resources, she

knew the people at Lincoln #2 who held the other positions identified in the policy. (Filing 34-3 (Pl.'s Dep.) at 45:24-46:16.)

14.    In September 2005, Plaintiff completed Hy-Vee's workplace harassment training and prevention program.  The program consisted of four training modules. (Filing 34-3 (Pl.'s Dep.) at 46:19-47:7; Filing 34-4 at CM/ECF page 34 (Ex. 7 to Pl.'s Dep., Statement of Participation & Compliance) and CM/ECF pages 35-38 (Ex. 8 to Pl.'s Dep., Training Modules).)

15.    In 2006, Hy-Vee distributed a new Employee Handbook, which Plaintiff received, reviewed, and consulted.  (Filing 34-3 (Pl.'s Dep.) at 42:17-43:12; 43:21-24; filing 34-4 at CM/ECF pages 19-33 (Ex. 6 to Pl.'s Dep., 2006 Handbook).)

16.    Other than minor, nonessential revisions, Hy-Vee's discrimination and harassment policy did not change from its previous Employee Handbook. (Filing 34-2 (Ludwig Aff.) at ¶ 30.)

17.    Additionally, Plaintiff is certain that she saw Hy-Vee's discrimination and harassment policy posted in the break room at Lincoln #2.  (Filing 34-3 (Pl.'s Dep.) at 45:14-17.)

**Plaintiff's Allegations of Sexual Harassment**

18.    Plaintiff recounted four comments which she considered objectionable and stated that these comments "are the only . . . comments that [she was] claiming were sexual harassment . . . ." (Filing 34-3 (Pl.'s Dep.) at 68:7-23.)

19.    The first comment occurred in 2004, when Plaintiff's supervisor was Kitchen Manager Rusty Graves.  (Filing 34-3 (Pl.'s Dep.) at 68:24-69:6.)

-6-

20.     Graves explained to Plaintiff that he and his wife had been shopping for a house and there was a certain house that his wife really wanted to buy.  When his wife noticed that someone purchased the house, she asked him if he put a down payment on the house to surprise her, which he denied.  Graves explained that his wife had not spoken to him for a few days and said that he "needed some sugar." (Filing 34-3 (Pl.'s Dep.) at 68:10-21.)

21.     Plaintiff never reported Graves' comment to Hy-Vee or told anyone, including family, friends, or coworkers about the comment.  (Filing 34-3 (Pl.'s Dep.) at 69:12-16; 76:13-15.)

22.     The second comment was made in January 2006.  Gary McCormick told Plaintiff that after his wife had their baby, she quit her job, and they saved money on their taxes.  McCormick told Plaintiff that if her husband had a benefits package at his job, similar to her benefits package with Hy-Vee, Plaintiff and her husband would save money on their taxes if she quit her job.  (Filing 34-3 (Pl.'s Dep.) at 10:3-10; 71:5-20.) Plaintiff felt "humiliated" and "embarrassed" by this statement.  (Filing 34-5 (Unemp't Hr'g T) at 14:16-19.)

23.     The third comment was made in March 2006.  Plaintiff heard McCormick tell fellow deli employee Jacqlyn Reding, "I was thinking about you last night, but in a work-related way."  McCormick then told Ms. Reding that he was giving her a 50-cent raise.  (Filing 34-3 (Pl.'s Dep.) at 72:14-73:3; 73:20-24.)  There is no evidence this comment was reported.

24.     Finally, in November or December 2006, Plaintiff overheard Kitchen Manager Rusty Graves and Bakery Manager Matt Baxa talking about a football game

in Kansas City[4].  Graves commented that there were fourteen inches of snow on the ground and that if he could convince his wife that he was fourteen inches [referencing his penis], he would have it made.  ([Filing 34-3](#) (Pl.'s Dep.) at 68:2-6; 75:1-14.)

## Plaintiff's Promotion to Deli Manager

25.     Jim Stoll was the Deli Manager prior to Plaintiff.  Stoll voluntarily resigned as the Deli Manager after Hy-Vee pressured him to increase his sales and to improve his gross revenue.  ([Filing 34-3](#) (Pl.'s Dep.) at 56:4-25.)  Store Director Matt Ludwig testified that Stoll did not attain these goals and left on "good terms" to pursue another job interest.  ([Filing 34-6](#) (Ludwig Dep.) at 23:10-19.)

26.     In July 2005, Manager of Perishables Brian Amsberry and Store Director Matt Ludwig interviewed and selected Plaintiff for the Deli Manager position. ([Filing 49-3](#) (Pl.'s Dep.) at 57:19-58:1.)[5]

27.     As the Deli Manager, Plaintiff's responsibilities included: (1) delegating tasks to employees; (2) conducting the monthly inventory; (3) ordering merchandise and supplies; (4) ensuring good customer service; (5) making sure the department ran efficiently; (6) developing the department's work schedule; (7) monitoring inventory and advertisements to ensure the department was adequately stocked with supplies; and (8) cleaning the display case and countertops.  ([Filing 34-3](#) (Pl.'s Dep.) at 64:9-19; 79:13-80:11.)

---

[4]In December 2006, Graves and Baxa were Plaintiff's peers, as they were all Department Managers.

[5]Plaintiff's deposition appears in both filings 34-3 and 49-3.

## Chronology of Events in 2006

*January 2006 Performance Review*

28.    In January 2006, Plaintiff was formally evaluated by Ludwig.  (Filing 34-3 (Pl.'s Dep.) at 86:6-16; Filing 34-4 (Deli Manager Review Form, which was Ex. 13 of Pl's Dep.) at CM/ECF pages 39-45 (Ex. 13 of Pl.'s Dep, Deli Manager Review Form).)

29.    Ludwig reviewed Plaintiff's responsibilities and completed the evaluation form while he talked to her about her performance.   For each responsibility, Ludwig rated Plaintiff's performance.  The ratings for Plaintiff ranged from 1 to 3.   The definitions on the evaluation form state as follows:   "1"– "performance does not meet expectations; "2"– "performance meets expectations"; and "3" – "performance exceeds expectations."  (Filing 34-3 (Pl.'s Dep.) at 86:17-87:1.)[6]

30.    As reflected in the Deli Manager Review Form, Plaintiff had thirty-six responsibilities.  Ludwig ranked Plaintiff's performance as not meeting expectations for the following twelve responsibilities: (1) "[s]ets the department standard for customer service, employee relations, cleanliness, sanitation, professional appearance, and overall profitability;" (2) "[d]etermines department goals with [S]tore [D]irector;" (3) "[i]nspects signage and displays for quality and quantity of merchandise and

_____

[6]Plaintiff chooses to believe that only a 1.0 score "does not meet expectations" and that any score between 1.1 and 2 "meets expectations."  *See, e.g.* Filing 45 (Pl.'s Br. in Opp.) at 4 (referencing D.'s fact no. 30).  The evaluation form itself belies this belief.  It is clear from the rating scale on the form that scores between 1 and 2 "do[] not meet expectations", and that only a score of 2 or higher "meets expectations." (Filing 34-4 at CM/ECF page 39 (Deli Manager Review Form).)

orders product for replenishment;" (4) "[f]igures retail pricing and ensuring correct pricing;" (5) "[e]xtends invoices, posting invoices, and oversees department bookkeeping procedures;" (6) "[a]nalyzes weekly and monthly sales and trends and compares to actuals [and] prepares ad projections;"(7) "[e]nsures pricing is competitive in the market area;" (8) "[f]ills displays and works in the sales area;" (9) "[p]erforms departmental duties as needed,"[7] (10) "[d]elegating duties, [f]ollow [t]hrough, and [o]rganization;" (11) "[s]upervision and [d]evelopment of [s]ubordinates;"[8] and (12) [a]ssuming [r]esponsibility." (Filing 34-4 (Deli Manager Review Form) at CM/ECF pages 39-44.)   Plaintiff was ranked as exceeding expectations in only one responsibility: "[w]illingness to make personnel-related decisions consistent with EEO objectives."   (Filing 34-4 (Deli Manager Review Form) at CM/ECF page 44.)

31.     Plaintiff did not have any complaints about this evaluation.  (Filing 34-3 (Pl.'s Dep.) at 87:2-4.)

*October 2006 Expectations*

32.     On October 20, 2006, which was nine months after Plaintiff's evaluation, Ludwig and McCormick provided Plaintiff with a list of expectations.  (Filing 34-3 (Pl.'s Dep.) at 102:23-103:3; Filing 34-4 at CM/ECF page 46 (Ex. 15 to Pl.'s Dep, Lincoln #2 Deli Mg'r Expectations) .)

---

[7]The duties "cleans case," and "[illegible] case - behind counter case" were handwritten in the comment section regarding this responsibility.  (Filing 34-4 at CM/ECF page 43 (Deli Manager Review Form).)

[8]"[N]ight training" was handwritten in the comment section regarding this responsibility.  (Filing 34-4 at CM/ECF page 44 (Deli Manager Review Form).)

33.   The list contained the following expectations (cited verbatim below):

1.   Work expected # of hours.  Typical schedule should be 7am to 6pm.  (4-7 is store's busiest time).  One evening shift per week required to be worked in the department. The manager needs to be here during busiest hours to grow the business!

2.   All company code dating policies will be strictly followed. Cutting corners is not ethical and unacceptable.   All employees must be trained to follow shelf-dating standards.

3.   Out-of-stocks must be reduced!  Zero out-of-stocks is the goal.  Better planning is needed on ad items.  Use ad local ad updates as a tool.  Track what we ran out of in order to not make the same mistake twice.

4.   Case-cleanings! Twice annually using company specified cleaning/sanitation Agents. (Eliminex & J5-12.) when are they being cleaned? This needs to be scheduled. Delicatessin [sic] case (sliced meats and cheese) needs to be cleaned and sanitized once weekly.  When?

5.   Promotions/demos[.]    Weekend promotions are not optional. [W]hat is this weekend[']s promotion?  Silent demos nightly from 4pm – 7pm!  Think out side of the box. Demo more variety.

6.   Improve total department cleanliness and sanitation.  Look at department from Customers' perspective.  Clean up the clutter on counter, in front of back bar, on wood merchandising rack in front of counter, etc.  Daily!  Food safety schedule must be followed.

7.   Stronger department communication is need[ed]. Special events (anniversary Celebration, springtime party, sales goals, ad items, daily expectations, department head

-11-

meeting notes, etc.)  Does everyone in the deli know what
is going on this week?

8.    International cheese case must be stocked and faced daily.
1 tpd [temporary price decrease] per shelf on Every 4 ft
section.  What is our push item in this case today?

(Filing 34-4 at CM/ECF page 46 (Lincoln #2 Deli Mg'r Expectations).)   The
document concluded with the statement "[f]ailure to accomplish and consistently
maintain goals by Nov. 5 2006 will result in disciplinary action up to and including
termination." (*Id.*)

34.    Ludwig, who did most of the talking, went down the list and explained
each expectation.  (Filing 34-3 (Pl.'s Dep.) at 103:24-104:3.)

35.    From some point early in 2006 (recall that Plaintiff became Deli
Manager in July 2005), Plaintiff worked from 7 a.m. to 5 p.m., five days a week.
(Filing 34-3 (Pl.'s Dep.) at 94:20-95:4.)  When discussing the first of the October,
2006 expectations, Ludwig explained that because the store's busiest hour was from
5 p.m. to 6 p.m., he expected Plaintiff to work from 7 a.m. to 6 p.m. four days a week,
and one evening shift a week.[9]  Plaintiff understood that she was being asked to work
different hours to cover the store's busiest hour.  (Filing 34-3 (Pl.'s Dep.) at 104:6-13;
104:19-22.)

36.    Plaintiff did not voice any complaints about changing her schedule
(filing 45 (Pl.'s Br. in Opp'n to Summ. J.) at 6), but claims that this expectation was

_____

[9]Plaintiff's deposition testimony indicates that 5 p.m to 6 p.m. is the store's
busiest hour.  The Deli Manager Expectations document indicates that the busiest
time is from 4 p.m to 7 p.m.

unfair because no other Department Managers worked an evening shift.  Plaintiff has no foundation for this statement other than her unsupported belief.[10]

37.    Plaintiff admits, however, that Jim Stoll, the former Deli Manager, worked one evening shift a week.  (Filing 34-3 (Pl.'s Dep.) at 104:23-105:7.) [11]

38.    The average Department Manager worked about 45 hours a week. (Filing 34-3 (Pl.'s Dep.) at 96:17-25.)[12]

---

[10] Plaintiff indicated that she "just knew from being there that they were there during the day" and "just knew that they didn't [work the night shift]" because "I was there during the day.  They were there during the day."  (Filing 34-3 (Pl.'s Dep.) at 104:14-18; 105:12-18; 105:24-106:18.)  However, Plaintiff admitted in her deposition that she did not ask the department managers whether they worked night shifts but "just knew" that they did not.  (Id. at 106:12-24.)

Even if Plaintiff's speculation was admissible, it does not establish disparate treatment based on sex.  There was one other female manager during Plaintiff's tenure as manager.  (Filing 34-5 (Unemployment Hr'g T.) at 19:6-12 (floral department manager was female).)  If no other manager worked evening shifts, then the other female manager did not work evening shifts.

[11] Plaintiff asserts that "Stoll *chose* to work one night shift to accommodate his schedule for his second job."  (Filing 45 (Pl.'s Br. in Opp.) at 6 (emphasis added).) There is no support for this assertion other than Plaintiff's unsupported belief that Stoll had an atypical schedule because he also worked another job as a food broker and "worked . . . an evening because he had to be in Omaha during the day for his other business."  (Filing 34-3 (Pl.'s Dep.) at 105:1-7.)  Though there is other evidence that Stoll had a second job (Filing 34-6 (Ludwig Dep.) at 23:15-19), there is *no* evidence that Stoll worked the evening shift by choice.

[12] Plaintiff asserts that the other department heads were gone by 5 p.m.  (Filing 45 (Pl.'s Br. in Opp'n) at 6.)  This assertion lacks foundation for the same reason that the statement that the other department heads did not work evening shifts lacks foundation.  Additionally, the portion of the record cited by Plaintiff to support the assertion does not indicate what time of the day the other managers typically left

-13-

39.     After Plaintiff's schedule changed (to 7 a.m. to 6 p.m., and one evening shift a week, with a daily one hour lunch break), she too worked 45 hours a week. (Filing 34-3 (Pl.'s Dep.) at 149:24-150:16; Filing 34-5 (Unemployment Hr'g T.) at 21:10-22:9.)

40.     Plaintiff acknowledges that there were occasions when items were out of stock (third expectation).  (Filing 34-3 (Pl.'s Dep.) at 108:8-16; 108:20-109:6.)

41.     In regards to the fourth expectation, Plaintiff explained that she was already cleaning the case as required.  (Filing 34-3 (Pl.'s Dep.) at 109:7-25.)

42.     For the fifth expectation, McCormick explained that he wanted a demo or sample tray put out every evening.  Before then, Plaintiff had only prepared demos for the weekends.  (Filing 34-3 (Pl.'s Dep.) at 110:1-15.)

43.     For the sixth expectation, Ludwig told Plaintiff to remove the sanitizer bucket from the counter and to clean up the food production.  Plaintiff assumed that Ludwig meant that if she was in the middle of making pizzas and needed to help a customer, she should put all the food away, help the customer, and then bring all the food back out.  (Filing 34-3 (Pl.'s Dep.) at 110:17-23; 111:4-13; 111:18-112:1.)

44.     In regards to the seventh expectation, Plaintiff told Ludwig and McCormick that she believed employees were already aware of all of the events. (Filing 34-3 (Pl.'s Dep.) at 112:2-17.)

45.     For the eighth expectation, Ludwig wanted to ensure that a specialty item was demoed each week.  He also wanted to ensure that there were several temporary price declines in the case.  (Filing 34-3 (Pl.'s Dep.) at 112:18-25.)

---

work.

46.     The coaching session lasted about 45 minutes.  ([Filing 34-3](Pl.'s Dep.) at 113:1-2.)

47.     During the coaching session, Plaintiff was upset, mainly because she had to change her schedule.  ([Filing 34-3](Pl.'s Dep.) at 113:3-6.)

48.     Plaintiff was also shocked that the Deli Manager Expectations indicated that failure to accomplish and consistently maintain the goals as listed by November 5, 2006 would result in disciplinary action up to and including termination.  ([Filing 34-3](Pl.'s Dep.) at 113:15-22; [Filing 34-4](at CM/ECF page 46 (Ex. 15 to Pl.'s Dep., Lincoln #2 Deli Mg'r Expectations).)  Plaintiff believed that she was already meeting all of the expectations and "there was no cause for the disciplinary nature of the memo."  ([Filing 45](Pl.'s Br. in Opp'n) at 8.)

49.     A day or two later, Plaintiff contacted former Kitchen Manager Sharon Dovel.  Plaintiff told Ms. Dovel that she was surprised that the Manager Expectations stated that her employment could be terminated.  ([Filing 34-3](Pl.'s Dep.) at 114:14-17; 115:3-12.)

50.     Plaintiff explained that she did not know who she could talk to about the expectations because Ludwig wrote them.  Ms. Dovel recommended that Plaintiff contact Regional Supervisor Pat Hensley, but Plaintiff felt more comfortable contacting Regional Meat and Deli Supervisor Jason Pride.  ([Filing 34-3](Pl.'s Dep.) at 114:19-115:2.)

*October 21, 2006 Call to Regional Meat and Deli Supervisor Pride*

51.     On October 21, 2006, Plaintiff called Pride because she was afraid of losing her job.  She believed that she "did everything I could to do what they wanted me to do."  ([Filing 34-5](Unemployment Hr'g T.) at 22:12-23:6; 24:7-14.)

52.     Plaintiff told Pride about the Deli Manager Expectations, and that the document provided she could be fired if she did not accomplish and consistently maintain the goals.  Plaintiff believed Pride was surprised because he knew that her "gross had been good and sales were above normal."  ([Filing 34-3](#) (Pl.'s Dep.) at 115:13-15; 116:6-12.)

53.     Plaintiff told Pride that she believed it was unfair that she had to change her schedule to work 7 a.m. to 6 p.m., four days a week, and also work an evening shift.  ([Filing 34-3](#) (Pl.'s Dep.) at 115:19-23.)

54.     Plaintiff then told Pride about the comment McCormick made to Ms. Reding in March 2006.  ([Filing 34-5](#) (Unemployment Hr'g T.) at 23:13-25.)

55.     This was the first time Plaintiff had ever reported this comment to anyone.  ([Filing 34-3](#) (Pl.'s Dep.) at 74:3-14.)[13]

56.     Pride told Plaintiff that he was going to be in Lincoln in a day or two, and that he would talk to McCormick about the comment.  ([Filing 34-3](#) (Pl.'s Dep.) at 117:10-16; 119:12-23.)

57.     Pride also told Plaintiff that he would contact her after he talked to McCormick.  ([Filing 34-3](#) (Pl.'s Dep.) at 118:11-13.)

58.     Because Plaintiff was off work when Pride was in Lincoln, and he had not contacted her, she called him when she returned to work to ask about her new schedule.  ([Filing 34-3](#) (Pl.'s Dep.) at 118:14-22.)

---

[13]Ms. Reding did not report this comment either. ([Filing 34-3](#) (Pl.'s Dep.) at 74:15-18.)

-16-

59.    Pride told Plaintiff that she was required to work the new schedule. ([Filing 34-3](#) (Pl.'s Dep.) at 118:18-22.)

60.    Plaintiff did not ask, nor did Pride mention, anything about McCormick's comment to Ms. Reding.  ([Filing 34-3](#) (Pl.'s Dep.) at 121:4-14.)

61.    After Plaintiff complained to Pride, Ludwig called Plaintiff at home to tell her that he had talked to Pride and asked her to come in and meet with him. ([Filing 34-3](#) (Pl.'s Dep.) at 135:11-14.)

62.    When they met, Ludwig told Plaintiff that he found it "disheartening" that she would call Corporate rather than talk to him personally if she had problems with the Manager Expectations.  ([Filing 34-3](#) (Pl.'s Dep.) at 135:11-24.)

63.    Plaintiff believes that Ludwig was referencing not only the Manager Expectations, but also McCormick's comment, and that Ludwig wanted to ensure that she did not focus on the schedule change to the exclusion of the other manager expectations.  ([Filing 34-3](#) (Pl.'s Dep.) at 136:7-12 ("he found it 'disheartening' that I would call corporate on them, you now, about the comment that Gary made, and that he just wanted to make sure that I wasn't completely focusing on the schedule change . . . .")

64.    Ludwig was "disappointed" because, as a Department Manager, she had been trained on handling sexual harassment complaints, yet she did not timely report the harassment allegation.  In addition, Ludwig was disappointed that Plaintiff did not feel comfortable coming to him to discuss her concerns although they had worked together for several years.  ([Filing 34-6](#) (Ludwig Dep.) at 50:5-20.)

65.    After speaking to Pride and Plaintiff, Ludwig spoke with McCormick about the comment he made to Ms. Reding.  ([Filing 34-2](#) (Ludwig Aff.) at ¶¶ 15-16.)

-17-

66.     McCormick admitted that he told Ms. Reding, "I was thinking about you last night," and quickly realized that his words could be taken out of context, so he clarified, "in a work-related way." ([Filing 34-2](#) (Ludwig Aff.) at ¶ 16.)

67.     McCormick said he then discussed a work-related issue that he thought about the prior evening–he told her that she was getting a pay raise. ([Filing 34-2](#) (Ludwig Aff.) at ¶ 16; [Filing 44-3](#) (Unemployment Hr'g T.)[14] at 18:3-10.)

68.     Based on Hy-Vee's investigation, Ludwig concluded that Plaintiff took Mr. McCormick's comment out of context. ([Filing 34-2](#) (Ludwig Aff.) at ¶ 17.)

69.     When Plaintiff returned to work after Pride had talked to McCormick about the comment Mr. McCormick made to Ms. Reding in March 2006, McCormick came into the deli and said, "You know, I was thinking last night, we should change this sign." ([Filing 34-3](#) (Pl.'s Dep.) at 118:25-119:6; 119:24-120:5.)

70.     Plaintiff believes that McCormick made this comment to rub it "in [her] face" that he had not been disciplined, and that "nothing was going to change." ([Filing 34-3](#) (Pl.'s Dep.) at 118:25-119:11; 120:1-17.)

71.     McCormick did not make any other comments that led Plaintiff to draw this conclusion. ([Filing 34-3](#) (Pl.'s Dep.) at 120:13-17.)

72.     Plaintiff normally met with Ludwig and McCormick on the first Monday of the month for an inventory meeting. ([Filing 34-3](#) (Pl.'s Dep.) at 90:3-9; 123:17-21.) The first Monday of November 2006 fell on November 6.

---

[14]Portions of this transcript appear in filing 34-5 as well as filing 44-3.

73.     Plaintiff does not remember everything that was discussed in the November inventory meeting, but she specifically remembers that the Manager Expectations were not discussed.  ([Filing 34-3](#) (Pl.'s Dep.) at 123:4-16.)

74.     According to Plaintiff, Ludwig and McCormick did not discuss Plaintiff's performance with her again until the December 4, 2006 inventory meeting. That meeting lasted about two hours.  ([Filing 34-3](#) (Pl.'s Dep.) at 124:2-11.)

75.     During the December 4 inventory meeting, Ludwig and McCormick reviewed the deli's November inventory and went over the Manager Expectations. They told Plaintiff they did not believe she completed the Manager Expectations to Hy-Vee's standards.  ([Filing 34-3](#) (Pl.'s Dep.) at 125:2-14.)

76.     Plaintiff asked what she could do better, but Ludwig told her that keeping her deli manager job was not an option, and specifically stated: "You're being demoted."[15]  ([Filing 34-3](#) (Pl.'s Dep.) at 125:14-126:4.)

77.     Ludwig asked McCormick if there were any full-time positions available, and McCormick responded, "No."  ([Filing 34-3](#) (Pl.'s Dep.) at 128:4-11.) McCormick then stated that "[Plaintiff] would have a bad attitude if [she] were to stay, and . . . that it wouldn't be fair to the other full-time employees if [she] were to stay and have a bad attitude" and that ""maybe we should go our separate ways." ([Filing 44-3](#) (Unemployment Hr'g T.) at 27:2-13.)  Plaintiff was not told what hours she would be working, what position she would have, or what her pay would be. ([Filing 44-3](#) (Unemployment Hr'g T.) at 26:4-25.)

---

[15]Hy-Vee denies Plaintiff was ever demoted, but assumes the truth of this assertion for purposes of its motion.  ([Filing 33](#) (D.'s Br. In Supp. of Mot. for Summ. J.) at 14 n.6.)

78.     Because Plaintiff was so upset during the December 4, 2006 meeting, Ludwig told her that he wanted to postpone discussion of a list that he was giving all Department Managers and asked her if she would meet with him the next day to review that list.  (Filing 34-3 (Pl.'s Dep.) at 127:9-18.)

79.     During the meeting with Ludwig on December 5, 2006, Plaintiff asked Ludwig for another chance, and he again reiterated that it was not an option; she was demoted.  (Filing 34-3 (Pl.'s Dep.) at 126:15-25; 129:14-19.)

80.     During the December 5, 2006 meeting, Ludwig again mentioned that it was "disheartening" that Plaintiff would call Corporate on them.  (Filing 34-3 (Pl.'s Dep.) at 132:5-12.)

81.     Plaintiff explained to Ludwig that she felt comfortable with Pride, and just wanted another opinion about everything that was going on.  (Filing 34-3 (Pl.'s Dep.) at 138:5-14.)

82.     During the December 5, 2006 meeting, Plaintiff reported to Ludwig for the first time, McCormick's comment that if she quit, she and her husband would save money on their taxes.  (Filing 34-3 (Pl.'s Dep.) at 133:12-24.)

83.     Prior to telling Ludwig about McCormick's comment, Plaintiff had never told anyone else, including family, friends, or coworkers about the comment.  (Filing 34-3 (Pl.'s Dep.) at 72:5-9.)

84.     Ludwig acted surprised by McCormick's comment.  (Filing 34-3 (Pl.'s Dep.) at 129:23-25.)

85.     Plaintiff told Ludwig that she did not think McCormick wanted her working in the store and, since McCormick was his assistant, she believed Ludwig felt the same way.  (Filing 34-3 (Pl.'s Dep.) at 127:19-128:3.)

86.     When Ludwig "learned that [Plaintiff] believed that Mr. McCormick had 'made a point' to tell her that his wife stays at home with their children," Ludwig interviewed McCormick about the comment.  (Filing 34-2 (Ludwig Aff.) at ¶ 18.)

87.     McCormick explained that when Plaintiff asked him what his wife did, "he noted that his wife stays at home with their children.  McCormick further explained to [Plaintiff] that he and his wife decided it was not financially in their best interest for her to work outside of the home, and that he thought they may be knocked into a lower tax bracket since she was not earning an income."  (Filing 34-2 (Ludwig Aff.) at ¶ 19.)

88.     McCormick "denied ever suggesting that Plaintiff should quit her job." (Filing 34-2 (Ludwig Aff.) at ¶ 19.)   McCormick did tell Plaintiff that if her husband's job carried benefits, she and her husband "might save money on [their] taxes if [she] would quit her job." (Filing 34-5 (Unemployment Hr'g. T.) at 14:6-12.)

89.     Based on Hy-Vee's investigation, Ludwig concluded that Plaintiff took McCormick's comment out of context.  (Filing 34-2 (Ludwig Aff.) at ¶ 20.)

90.     During the December 5, 2006 meeting, Plaintiff also told Ludwig about Graves' "14 inches" comment.  Ludwig told Plaintiff that he would investigate the comment.  (Filing 34-3 (Pl.'s Dep.) at 133:17-134:6.)

91.     Ludwig interviewed Baxa and Graves about the comment, who admitted it had been made.  (Filing 34-3 (Pl.'s Dep.) at 133:17-134:14.)

-21-

92.     Ludwig advised Graves that any other similar comments would result in discipline.  ([Filing 34-5](#) (Unemployment Hr'g T.) at 15:16-16:21.)

93.     Ludwig told Plaintiff that he had spoken to Graves and that if Graves ever made another comment like that again, he would be disciplined.  ([Filing 34-3](#) (Pl.'s Dep.) at 133:17-134:14; [Filing 34-5](#) (Unemployment Hr'g T.) at 15:16-16:21.)

94.     Plaintiff believed that Graves should have received harsher discipline as he only received a "slap on the wrist."  ([Filing 34-5](#) (Unemployment Hr'g T.) at 35:16-25.)

### Plaintiff's Departure from Hy-vee

95.     On February 12, 2007, during her sworn testimony before the Department of Labor-Nebraska Appeal Tribunal, less than two months after leaving employment, Plaintiff testified as follows:

(a)     *On December 4, 2006, after being demoted, she "quit."* ([Filing 34-5](#) (Unemployment Hr'g T.) at 10:14-16.)

(b)     Plaintiff gave two weeks' notice. ([Filing 34-5](#) (Unemployment Hr'g T.) at 10:17-21.)

(c)     Plaintiff told Ludwig that she was quitting because she believed that she was working in a "hostile work environment." ([Filing 34-5](#) (Unemployment Hr'g T.) at 12:20-13:7; 31:8-10.)

(d)     *After* she resigned, Plaintiff told Ludwig about McCormick's January 2006 comment (that if she quit her job, she and her husband would save money on their taxes) and Graves' December 2006 comment (that if he

-22-

could convince his wife that he was 14 inches, he would have it made). (Filing 34-5 (Unemployment Hr'g T.) at 12:20-16:12.)

(e)     Plaintiff took the last three days of her employment off as personal days, and her last day of employment was December 16, 2006.  (Filing 34-5 (Unemployment Hr'g T.) at 12:8-16.)

96.     During her January 15, 2008 deposition, more than two years after her resignation, Plaintiff again testified that Ludwig demoted her, but specifically testified that she did not resign and that she understood she had been fired.  (Filing 34-3 (Pl.'s Dep.) at 124:2-13, 131:4-5, 132:13-15.)

97.     Plaintiff further testified at her deposition that Ludwig told her she had two weeks to work in her current position, and then her position would end.  (Filing 34-3 (Pl.'s Dep.) at 130:21-25.)

### Plaintiff's Sex Discrimination Claim

98.     Plaintiff claims that Hy-Vee discharged her because of her gender. (Filing 34-3 (Pl.'s Dep.) at 157:15-158:1.)  Plaintiff believes that McCormick did not think that mothers should be in management positions.  (Filing 34-3 (Pl.'s Dep.) at 170:25-171:10.)

99.     Plaintiff's belief as to McCormick's views on mothers in management positions is based solely on the comment McCormick made to her in January 2006 about saving money on her taxes if she quit her job.  (Filing 34-3 (Pl.'s Dep.) at 171:5-10.)

100.   Plaintiff does not know if McCormick or Ludwig decided to terminate her employment, assuming she was terminated and did not quit.  ([Filing 34-3](#) (Pl.'s Dep.) at 158:6-9.)

## Plaintiff's Retaliation Claim

101.   Plaintiff claims that Hy-Vee discharged her for calling Corporate (Regional Superviser Pride) on October 21, 2006.  ([Filing 34-3](#) (Pl.'s Dep.) at 158:22-159:2.)

102.   Plaintiff's retaliation claim is based solely on the fact that Ludwig told her that it was "disheartening" that she contacted Corporate.  The following exchange occurred during her deposition:

> Q:   And *you believe that the termination was in retaliation for you calling corporate*.  And the reason you believe that is because Matt Ludwig mentioned to you twice that he thought it was disheartening that you contacted Jason Pride?
>
> A:   Yes, or corporate was what he said.
>
> Q:   Corporate.  Okay.  Any, *any other reason you believe it was retaliation*?
>
> A:    *No.*

([Filing 34-3](#) (Pl.'s Dep.) at 158:22-159:5 (emphasis added).)

-24-

## Male Department Managers Who Also Received
## Performance Expectations

103.   Ludwig provided expectations documents similar to the one provided to Plaintiff to at least three male Department Managers when they were being coached regarding performance problems: Mr. Stoll (deli manager prior to Plaintiff), 2004 Bakery Manager Bob Tetmeyer, and 2006 Bakery Manager Matt Baxa.  (Filing 34-6 (Ludwig Dep.) at 19:12-24, 21:16-20, 38:5-9, 42:9-20, 44:12-45:4; Filing 34-4 at CM/ECF pages 47-48 (Ex. 23 to Pl.'s Dep., Lincoln #2 Bakery Objectives for Baxa); Filing 34-4 at CM/ECF page 49 (Ex. 24 to Pl.'s Dep., Lincoln #2 Bakery Objectives for Tetmeyer ); Filing 34-4 at CM/ECF page 50 (Ex. 25 to Pl.'s Dep., Deli Goals for Stoll).)

104.   The Deli Manager prior to Plaintiff, Stoll, received a list of Delicatessen Goals. (Filing 34-6 (Ludwig Dep.) at 19:12-24; Filing 34-3 (Pl.'s Dep.) at 155:15-18; Filing 34-4 at CM/ECF page 50 (Ex. 25 to Pl.'s Dep., Deli Goals for Stoll).)  When asked why Stoll's goals did not include anything about hours, Ludwig stated that was because Stoll "didn't have that problem . . . ."  (Filing 44-4 (Ludwig Dep.) at 38-27-39:5.)[16]

105.   Stoll did not satisfy the goals and ultimately resigned his employment. (Filing 34-6 (Ludwig Dep.) at 23:9-19.)

106.   In 2004, Bakery Manager Bob Tetmeyer received a list of Bakery Objectives.  (Filing 34-6 (Ludwig Dep.) at 38:5-9; Filing 34-3 (Pl.'s Dep.) at 155:8-12; Filing 34-4 at CM/ECF page 49 (Ex. 24 to Pl.'s Dep., Lincoln #2 Bakery Objectives for Tetmeyer).)  Ludwig stated that Tetmeyer's objectives did not include

---

[16]The Ludwig deposition appears in both filing 34-6 and filing 44-4.

-25-

anything about his work schedule because he "had absolutely no problem working hours."  (Filing 44-4 (Ludwig Dep.) at 38:15-16.)

107.   On July 19, 2006, Bakery Manager Matt Baxa received a list of Bakery Objectives.  (Filing 34-6 (Ludwig Dep.) at 44:12-45:4; Filing 34-3 (Pl.'s Dep.) at 154:12-17; Filing 34-4 at CM/ECF pages 47-48 (Ex. 23 to Pl.'s Dep., Lincoln #2 Bakery Objectives for Baxa).)

108.   Among other concerns, Ludwig had problems with Baxa's attendance. Baxa's Bakery Objectives noted that he was required to work the hours that were *mutually agreed upon* by the Store Director or Manager of Perishables each week. (Filing 34-6 (Ludwig Dep.) at 45:5-18 (emphasis added); Filing 34-4 at CM/ECF page 48 (Ex. 23 to Pl.'s Dep., Lincoln #2 Bakery Objectives for Baxa).)

109.   Like the document provided to Plaintiff, the expectations documents provided to Tetmeyer and Baxa both stated:  "Failure to meet these objectives by [a certain date] or failure to consistently achieve them there after may result in termination."  (Filing 34-4 at CM/ECF page 49 (Ex. 24 to Pl.'s Dep., Lincoln #2 Bakery Objectives for Tetmeyer);  Filing 34-4 at CM/ECF page 48 (Ex. 23 to Pl.'s Dep., Lincoln #2 Bakery Objectives for Baxa).)

110.   Prior to receiving her expectations document in October, 2006, Plaintiff had not received any warnings or reprimands although she had received negative ratings on the January 2006 performance review.  During an unspecified time frame, Plaintiff brought her deli from 20th out of 40 stores to 6th, based on "comparison sheets."[17]  Over the year and a half she was deli manager, there was a sales increase, and her gross sales were above target.  (Filing 44-3 (Unemployment Hr'g T.) at 37:1-

---

[17]The record before me does not specify whether these documents compared sales or other measures of achievement, or the time frame involved.

22.)  However, Plaintiff's performance did not meet expectations on twelve of the thirty-six  criteria in her January 2006 performance rating.  ([Filing 34-4](#) at CM/ECF pages 39-45; *see* Fact No. 30, *supra*.)

111.  The expectations documents provided to Stoll, Tetmeyer and Baxa were different from the expectations document provided to Plaintiff because there were "different issues in play."  ([Filing 44-4](#) (Ludwig Dep.) at 51:13-52:8.)  Although the men received goals related to sales, they had problems with sales and Plaintiff did not.  Plaintiff was fixated on her sales and did not acknowledge inadequacies in other areas.  When questioned about the differences between the coaching expectations given to the men and those given to Plaintiff, Ludwig stated as follows:

> A:    These were the specific issues in play (indicating [the coaching expectations for the three men].  With [Plaintiff], her gross in sales, although she was fixated on those, that's not what we were talking about.  We were talking about cleanliness.  We were talking about code dating.  We were talking about out-of-stocks.
>
> Q:    And when you say she was fixated on those, she was pointing out to you –
>
> A:    Sure.
>
> Q:    – that her gross sales were . . .
>
> A:    At inventory meeting she would point that out, yes.  And I would say that's not the issue.  The issue is these types of things, cleanliness, et cetera.
>          . . .
> Q:    So what you're telling us is that [Plaintiff] would bring up the fact that her sales numbers appear to be successful –
>
> A:    She would.
>
> Q:    – and you would say, but that's not the problem?

([Filing 44-4](#) (Ludwig Dep.) at 52:10-53:24.)

113.   Neither Stoll, Tetmeyer, nor Baxa ever reported discrimination or harassment while Ludwig served as the Store Director for Lincoln #2.   (Filing 34-2 (Ludwig Aff.) at ¶ 29.)

## II.  DISCUSSION

I apply the familiar standard of review for summary judgment but do not repeat it here.  I turn now to Plaintiff's claims.

### Hostile Environment

Plaintiff claims that Defendant discriminated against her based on sex by creating a hostile environment.   To establish a prima facie case of Title VII discrimination based on a sexually hostile environment, an employee is required to show:  (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition or privilege of employment.  *Schoffstall v. Henderson*, 223 F.3d 818, 826 (8th Cir. 2000).

Plaintiff asserts that she was subjected to unwelcome sexual harassment due to an "overall climate" of discrimination.  Plaintiff asserts three components of this overall climate of discrimination:  (1) she was given "subjective" performance goals as the deli manager, in contrast to what she describes as "objective" performance goals for male department managers, (2) she overheard or was the recipient of four sexually suggestive comments, and (3) a coworker who was not disciplined for making one of these comments "rubbed it in her face."[18]

---

[18]When Plaintiff returned to work after Pride had talked to McCormick about the March 2006 comment McCormick made to Reding (thinking about her, but in a work-related way), McCormick came into the deli and said "You know, I was thinking last night, we should change this sign." (*See* Fact No. 69.) Plaintiff believes

-28-

I first consider Plaintiff's assertion regarding the difference between her performance goals as the deli manager and the performance goals of male department managers. I find that the differences between those goals did not in any way contribute to a hostile environment. Defendant has established that the expectations documents in the record that were provided to Plaintiff's precedessor as the Deli Manager and two other male managers were tailored to the particular problems those men had. Each of those men had goals related to sales because they had problems with their sales. (*See* Fact Nos. 103, 111.) Plaintiff did not have sales goals in her expectations document because she did not have a problem with sales. (*See* Fact No. 111.) Only those men who had problems with the hours they worked, or with their work schedule, had goals related to hours or schedules. (*See* Fact Nos. 104, 106, 108.) Plaintiff's predecessor did not meet his goals and resigned his employment. There is no evidence in the record that the two other male managers whose expectations documents appear in the record (Tetmeyer and Baxa) failed to meet their expectations. The expectations documents of those two other managers did, however, include language stating that failure to meet the objectives by a stated date might result in termination. (*See* Fact No. 109.)

I now consider the comments Plaintiff cites as evidence of hostile environment. They are as follows:

1.     2004 comment by then-supervisor Graves that his wife was inattentive, so he "needed some sugar." (*See* Fact No. 20.)

2.     January 2006 by McCormick, then Plaintiff's supervisor, who commented that after his wife had a baby, there was a tax savings to having her stay at home and suggested that Plaintiff might discover a similar tax savings. (*See* Fact No. 22.) This comment was first reported in the December 5 meeting which followed

---

that McCormick made this comment to rub it "in [her] face" that he had not been disciplined, and that "nothing was going to change." (*See* Fact No. 70.)

Plaintiff's December 4 demotion and resignation. (*See* Fact No. 82.)

3. March 2006 comment by McCormick, Plaintiff's supervisor, who overheard him say that he had thought about a fellow female deli employee (Ms. Reding) the prior evening in a work-related way. (*See* Fact No. 23.) This comment was not reported until Plaintiff's October 21, 2006 telephone call to regional manager Pride. (*See* Fact No. 54.)

4. McCormick's comment to Plaintiff after her October 31, 2006 phone call to Pride and after Pride had investigated and determined not to discipline McCormick. Plaintiff interpreted this as a "rub it in your face" comment indicating that nothing would change. (*See* Fact Nos. 69, 70.) This comment was never reported.

5. November or December 2006 comment of fellow manager Graves regarding a fourteen inch penis. (*See* Fact No. 24.) This comment was first reported in the December 5 meeting which followed Plaintiff's December 4 demotion. (*See* Fact No. 90.)

Plaintiff must "'prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior.'" *Hervey v. County of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) (quoting *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005). This is critical, as "'Title VII does not prohibit all verbal or physical harassment in the workplace and is not a general civility code for the American workplace.'" *Id.* (again quoting *Pedroza*, 397 F.3d at 1068). Put another way, the comments must be "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Meritor Savings Bank, VSB v. Vinson*, 477 U.S. 57, 65 (1986). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988).

In examining whether commentscreate an actionable hostile environment, the court examines "the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance." *Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006)* (citing *Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)*.)

No rational jury could find that the comments of which Plaintiff complains permeated her work environment with discrimination such that the terms, conditions, or privileges of her employment were altered. They are less severe and less pervasive than the comments found *not* to alter a term, condition or privilege of the plaintiff's employment in *Duncan v. Gen. Motors Corp., 300 F.3d 928 (8th Cir. 2002)* (over a three year period, the training coordinator asked plaintiff to have a relationship with him, touched her hand on four to five occasions, requested that she sketch a sexually objectionable planter, asked her to complete a task on his computer when its screen saver depicted a naked woman, hung an offensive poster, asked her to type a document containing sexually offensive terms, and on two occasions showed her a child's pacifier shaped like a penis). The fact that Plaintiff never reported two of the comments indicates that they did not alter a term, condition or privilege of her employment.

### Disparate Treatment

Plaintiff also asserts that the fact that her Deli Manager Expectations differed from those expectations given to male managers constitutes unlawful disparate treatment. There is no actionable disparate treatment unless the male managers were similarly situated. *E.g., Bearden v. Int'l Paper Co., 529 F.3d 828, 832 (8th Cir. 2008)* (no gender discrimination unless female plaintiff treated differently from similarly situated male employees). As I have already explained, they were not. Plaintiff and

the other male managers had different performance problems, the expectations documents were tailored to the performance problems of the particular manager, and there was no reason for Plaintiff's expectations document to include sales goals when she had no problem with sales. There is no evidence that the male managers who had performance expectations had problems with the areas of Plaintiff's expectations that she describes as subjective.

I reject Plaintiff's assertions that Defendant's articulated non-discriminatory reason for her demotion ("failure to fulfill job expectation") is pretext because "Plaintiff has shown that she was meeting all *sales* goals and was not previously warned or reprimanded for any performance issues and no action was taken at the November 5th deadline for her to perform." (Filing 45 (Pl.'s Br. in Opp'n to Summ. J.) at 38 (emphasis added).) The fact that Plaintiff met *sales* goals did not absolve her of the need to meet or exceed other expectations for her performance. At her January 2006 performance review, Plaintiff failed to meet expectations in twelve of thirty-six rated areas.[19] The Deli Manager Expectations closely correlate to the areas in which Plaintiff failed to meet expectations in her performance. Although those expectations stated that failure to meet the expectations by November 5 would result in disciplinary action up to and including dismissal (*see* Fact No. 33), Plaintiff's failure to meet the expectations was not discussed on November 6, 2006, when Plaintiff met with Ludwig and McCormick for a regularly scheduled monthly inventory meeting. (*See* Fact No. 73.) Her performance was not discussed until the December 4, 2006 monthly inventory meeting. It is quite plausible that management needed more than one day to assess whether Plaintiff had met the expectations and to determine what disciplinary action was appropriate.

---

[19]In this regard, I note that Plaintiff's assertion that she had no performance issues is based on her unfounded belief that the rating scale on the Evaluation Form does not mean what it says. *See* footnote to Fact No. 29.

As a side note, I observe that Plaintiff's brief continually refers to her October 20 expectations as unreasonably "subjective." The expectations included proper dating of food products, reducing the number of times food items were out of stock, cleaning the sliced meat and cheese case at least weekly, improving overall cleanliness and sanitation, having promotions on week days as well as weekends, and stocking the international cheese case daily. (*See* Fact Nos. 33, 42.) These expectations are hardly subjective, and perfectly reasonable for a grocery store deli.

### *Retaliation*

Plaintiff asserts that she was terminated because she opposed unlawful sex discrimination. To establish a prima facie case of retaliation, Plaintiff must assert that "(1) she engaged in statutorily protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." *Hervey*, 527 F.3d at 722. Ultimately, "[t]he plaintiff in a retaliation case must present sufficient evidence for a reasonable jury to conclude that her protected conduct was a determinative factor in a materially adverse employment action taken by the employer." *Id.*

Plaintiff asserts that she engaged in the protected conduct of reporting sexual harassment to Regional Manger Pride on October 21, 2006[20] and that subjective performance requirements were imposed on her after her report of sexual harassment. (Filing 45 (Pl.'s Br. in Opp'n to Summ. J.) at 33 ("The Plaintiff has produced sufficient evidence to establish a claim of retaliation. The Plaintiff was given subjective performance requirements which were more extensive than her male

---

[20]*Compare* Filing 33 (D's Br. in Supp. of Summ. J.) at page 17, proposed statement of fact no. 101 ("Plaintiff also claims that Hy-Vee discharged her for calling Corporate (Mr. Pride) on October 21, 2006 .") *with* Filing 45 (Pl.'s Br. in Opp. to Summ. J.) at page 17 ("Defendant's paragraph one hundred-one is uncontroverted.").

counter-parts, and these more extensive requirements were instituted after her report of sexual harassment.")  The undisputed facts establish that the asserted adverse action–the imposition of the performance requirements to which Plaintiff objects–was taken *before* she complained to Pride.  To state the obvious, there is no causal connection between the adverse action of the issuance of the Deli Manager Expectations on October 20 and the protected conduct consisting of the October 21 report to Pride.

Plaintiff may assert that her October 21 report to Pride was protected conduct that preceded her December 4 demotion.  However, "'more than a temporal connection between the protected conduct and the adverse employment action is required to create a genuine factual issue on retaliation.'"  *Hervey*, 527 F.3d at 723 (quoting *Kiel v. Select Arificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). This is particularly important where, as here, the employee was asked to correct performance problems on October 20 before she notified the employer of her protected activity on October 21.  As the Eighth Circuit has recently noted:

> "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.'"  *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002).  *See also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

*Hervey*, 527 F.3d at 723.  I find that no inference of retaliation arises from the fact that the October 21 protected conduct preceded the December 4 demotion.

Plaintiff may also be asserting that her *December 5* report of two comments to Ludwig constituted protected conduct.  If so, this protected conduct *did not precede*

-34-

any alleged retaliatory action and cannot be the basis of a retaliation claim. Plaintiff asserts that the retaliatory action consists of the imposition of the *October 20* performance requirement, which obviously precedes the December 5 protected conduct. If the adverse action allegedly taken in retaliation for December 5 protected conduct is Plaintiff's demotion, the undisputed facts establish that Plaintiff was demoted on *December 4*. (*See* Fact No. 95(a) and <u>filing 45</u> (Pl.'s Br. in Opp'n to Summ. J.) at 16 (specifically stating this statement of fact is uncontroverted).)

## III.  CONCLUSION

The evidence, viewed in the light most favorable to Plaintiff, shows that there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.   The comments Plaintiff finds objectionable did not create a hostile environment.   Furthermore, when comments were reported, Defendant promptly investigated them and took appropriate action.   The performance expectations imposed on Plaintiff are not indicative of a hostile environment, and do not reflect that Plaintiff was treated less favorably that similarly situated male managers. Plaintiff was demoted because she failed to meet performance expectations, and Plaintiff's demotion was not retaliation for any activity protected by Title VII.

For the foregoing reasons,

IT IS ORDERED:

1.     Defendant's motion for summary judgment (<u>filing 32</u>) is granted, and

2.      Judgment shall be granted by separate order.

August 7, 2008.                    BY THE COURT:

                                   *s/Richard G. Kopf*
                                   United States District Judge